IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 16, 2008

**STATE OF TENNESSEE v. JACKIE LYNN FOSTER, JR.**

**Direct Appeal from the Criminal Court for Knox County**
**No. 85358     Kenneth F. Irvine, Jr., Judge**

_____

**No. E2007-01585-CCA-R3-CD - Filed October 16, 2009**

_____

Defendant, Jackie Lynn Foster, Jr., was indicted for first degree premeditated murder. Following a jury trial, Defendant was found guilty of the lesser included offense of second degree murder, a Class A felony. The trial court sentenced Defendant as a Range I, standard offender, to twenty-three years. On appeal, Defendant argues that the evidence was insufficient to support his conviction, that the trial court erred in its sentencing determinations, and that the trial court erred in its admission of certain evidence. We conclude that the evidence was sufficient to support Defendant's conviction of second degree murder, and that Defendant waived his issue concerning the admissibility of evidence by not filing a timely motion for new trial. Although the trial court erred in applying one enhancement factor in determining the length of Defendant's sentence, we further conclude that the sentence imposed by the trial court was justified. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Jackie Lynn Foster, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Elizabeth Osborne testified that she was sixteen years old at the time of the offense and lived in Knox County. Ms. Osborne stated that she had dated David McFarland prior to the incident, but the couple were no longer in a relationship at the time of the offense. Ms. Osborne and a group of

her friends drove to Wal-Mart on November 25, 2005 in Megan Mitchell's Saturn. In addition to Ms. Osborne and Ms. Mitchell, the group included the victim, Joshua Underwood; Jannita Hardin, the victim's girlfriend; and the victim's and Ms. Hardin's two-year-old son. Ms. Osborne said that Ms. Hardin was African-American, and the victim was Caucasian. The couple also had a three-year-old daughter who was not with the group that night.

Ms. Osborne said that the group separated when they arrived at the store, and Ms. Osborne accompanied Ms. Hardin to the baby department. Ms. Osborne said that she received several cell phone calls from Mr. McFarland while she shopped during which he made racial slurs which angered Ms. Osborne. Ms. Osborne relayed her conversations with Mr. McFarland to Ms. Hardin who also became angry. Ms. Hardin spoke to Mr. McFarland briefly on Ms. Osborne's cell phone, and then handed the cell phone back to Ms. Osborne. Ms. Osborne hung up on Mr. McFarland.

Ms. Osborne told the victim about Mr. McFarland's telephone calls after they left the store. Ms. Osborne called Mr. McFarland back and handed the cell phone to the victim. The victim spoke briefly with Mr. McFarland and grew angry. The victim hung up the cell phone, and the group drove to the victim's apartment on Virginia Place where they met the victim's brother, Jeremy Hall. Mr. McFarland called Ms. Osborne and told her that Defendant was "going to bring [him] to fight," and told the group to meet him at the Super Wash House. The victim and Mr. Hall carried wooden sticks which Ms. Osborne described as approximately two to three feet in length and two inches in diameter. Ms. Osborne thought the sticks were "for scares."

The group drove to the carwash in Ms. Mitchell's Saturn. The victim sat in the front passenger seat, Mr. Hall sat behind Ms. Mitchell, and Ms. Osborne sat behind the victim. Mr. McFarland called Ms. Osborne on her cell phone, and Ms. Osborne told him that they were on their way. Ms. Mitchell pulled into the left of the carwash at the vacuuming station. Another car drove in from the right and stopped at an angle in front of Ms. Mitchell's vehicle. Ms. Mitchell identified Defendant at trial as the driver of the other vehicle and said that Mr. McFarland was also in the vehicle.

The victim and Mr. Hall jumped out of the Saturn and began striking Defendant's vehicle with their sticks. Ms. Osborne also jumped out of the vehicle and sat down in the front passenger seat. Ms. Osborne said that the victim broke Defendant's front windshield and Defendant exited his vehicle. The victim stood by the left front bumper of Defendant's vehicle. Ms. Osborne said that Defendant raised his arm up, and he held a gun in his hand. The victim called out, "He's got a gun," and turned to the right to run toward the Saturn. Ms. Osborne heard a gunshot and ducked down. Ms. Osborne stated that she heard two or three more gunshots.

The victim and Mr. Hall climbed into the Saturn through the left rear door, and Ms. Mitchell drove away from the carwash to the hospital. Ms. Mitchell said that the victim was "moaning and groaning," and Ms. Mitchell told him to try to stay awake. Ms. Mitchell called her father, and a group of family and friends met them at the hospital.

Ms. Osborne stated that she gave a statement to the police and then returned to her house. Ms. Osborne said that she saw two bullet holes near the front door, a bullet hole in her parents' bedroom window, and a bullet hole in the living room wall. Ms. Osborne stated that her parents and others were present in the house that night.

On cross-examination, Ms. Osborne acknowledged that she did not speak with Defendant that night on her cell phone and that Defendant had not made any racial slurs. Ms. Osborne said that Mr. McFarland, who was sixteen years old at the time of the shooting, was approximately five feet, two inches tall and weighed approximately one hundred twenty-five pounds while the victim was twenty-four years old and weighed approximately one hundred and eighty pounds. Ms. Osborne agreed that she got into the front seat of the Saturn so that the two men could jump into the back seat when the fight was over.

Ms. Osborne said that she did not remember telling the investigative officers that she did not know who Mr. McFarland would bring with him to the fight. Ms. Osborne said that she did not hear Defendant say anything before the shooting. Ms. Osborne acknowledged that she did not say in her written statement that the victim said, "He's got a gun," or that the victim had turned to run away from Defendant's vehicle when he was shot. Ms. Osborne said that the sticks were in the Saturn when she, Ms. Mitchell, and Mr. Hall drove to the police station later that night, and she did not know why the investigating officers did not find the sticks.

Megan Mitchell testified that she drove the victim, Ms. Hardin, the victim's son, and Ms. Osborne to Wal-Mart on November 25, 2005, at approximately 10:00 p.m. The group separated, and Ms. Mitchell accompanied the victim to the toy department. She and the victim finished shopping at approximately 11:20 p.m. and went to Ms. Mitchell's car to wait for the others. Ms. Osborne and Ms. Hardin returned approximately twenty minutes later. Ms. Mitchell said that the two women were upset over a telephone conversation with Ms. Osborne's ex-boyfriend, Mr. McFarland. Ms. Mitchell said that the victim grew upset about the calls and "his voice was cracking." The victim talked to Mr. McFarland and said, "Why are you threatening to lynch my wife and why are you threatening to slit my n____ babies' throats?"

Ms. Mitchell stated that the group returned to the victim's apartment. Ms. Mitchell described the victim as "nervous, upset," and said that he was "pacing the floor." Ms. Mitchell talked to two men on the cell phone, one of whom was Mr. McFarland. Ms. Mitchell could not identify the other male voice. The victim woke up his brother, Mr. Hall, who rode with the group to the carwash. The victim and Mr. Hall carried sticks. Ms. Mitchell said that no one carried guns, and she would not have driven Mr. Hall and the victim to the carwash if either of them had been armed with guns.

Ms. Mitchell said that she did not see any other vehicles when she first arrived at the car wash. The victim told her to drive around to the bays of the carwash. At that point, a maroon vehicle pulled in and stopped in front of her vehicle. The victim and Mr. Hall exited Ms. Mitchell's vehicle with their sticks and began striking the passenger side windshield of the other vehicle. Ms. Mitchell identified Defendant at trial as the driver of the maroon vehicle. Defendant got out of his

vehicle as the victim started walking in front of the maroon vehicle toward Ms. Mitchell's vehicle. Defendant stepped further away from his vehicle. Ms. Mitchell saw a gun in Defendant's hand and started screaming. Ms. Mitchell saw Defendant aim the gun at the victim and then heard a gunshot. The victim slumped over, holding his left side, and ran toward Ms. Mitchell's vehicle. Defendant smiled and moved his arm so that the gun was aimed at Ms. Mitchell. Ms. Mitchell heard another gunshot and a bullet struck the Saturn's roof on the passenger side where Ms. Osborne was sitting. Ms. Mitchell heard approximately two more gunshots as she drove away from the carwash.

On cross-examination, Ms. Mitchell said that she did not know either Mr. McFarland or Defendant prior to the shooting. Ms. Mitchell acknowledged that she said in her written statement to the police that neither she nor Ms. Hardin spoke with Mr. McFarland on the cell phone. Ms. Mitchell said that she thought the victim was just going to talk to Mr. McFarland and that he and Mr. Hall carried the sticks to protect her and Ms. Osborne in case Mr. McFarland was accompanied by other people. Ms. Mitchell stated that she did not notice whether the victim was still carrying his stick when he ran to her vehicle. Ms. Mitchell acknowledged that she did not tell the investigating officers that Defendant smiled at her after he shot the victim. Ms. Mitchell stated that she told the investigating officers that she did not see a gun in Defendant's hand when he first exited his vehicle.

Jeremy Hall testified that the victim woke him up at approximately midnight on November 25, 2005. Mr. Hall described the victim as "real excited and upset." The victim told Mr. Hall that he had received threats against his family. The victim told Mr. Hall to come with him to meet the person making the threats. Mr. Hall and the victim grabbed two poles before they left the apartment because they planned to hit the other man's vehicle. Mr. Hall said that they did not intend to hit anyone with the poles. Mr. Hall said that a red vehicle pulled into the carwash and stopped in front of Ms. Mitchell's vehicle. The victim got out of the vehicle, and Mr. Hall followed him. The victim ran to the front passenger side of the vehicle and struck the windshield with his pole. The victim started walking toward the front of the red vehicle, and Mr. Hall struck the passenger side windshield with his pole.

Mr. Hall heard the victim yell "[s]omething about a gun." Mr. Hall saw a man standing next to the red vehicle with a gun pointed at the victim. Mr. Hall identified Defendant at trial as the shooter. The victim had started to turn toward Ms. Mitchell's vehicle when Mr. Hall heard Defendant say, "Motherf___" and then he heard a gunshot. Mr. Hall stated that he heard something hit the roof of Ms. Mitchell's vehicle as he was getting into the vehicle. Mr. Hall said that the victim was not threatening Defendant when he was shot.

On cross-examination, Mr. Hall said that he did not know either Defendant or Mr. McFarland prior to the shooting. Mr. Hall acknowledged that the victim was carrying his pole as he ran around the maroon vehicle.

Detective Steve Still, with the Knoxville Police Department's violent crimes unit, received a call at approximately 12:40 a.m. from Baptist Hospital concerning the admission of a shooting victim on November 26, 2005. Detective Still interviewed Ms. Osborne, Ms. Mitchell, and Mr. Hall

separately at the police station later that morning. During the interviews, Detective Still was advised that the victim had died during surgery. Based on the interviews, Defendant was developed as a suspect. Detective Still determined that Defendant had been issued a traffic citation earlier that year while driving a maroon Ford Explorer. The citation listed Defendant's address as 2710 Copeland. Tax records showed that the property was owned by Jack and Sharon Foster. Detective Still also learned that Sharon Foster had filed a vandalism report on her Ford Explorer on November 26, 2005.

Detective Still reviewed the carwash's security tape. The tape revealed a maroon Ford Explorer pulling into one of the carwash bays. Three men exited the Saturn vehicle and stood for awhile. One of the men, dressed in a white, short-sleeved tee shirt, whom Detective Still identified as Defendant, walked forward, moving an object around in his back pants pocket. Detective Still stated that the three men appeared to be waiting for someone. The Explorer then left the carwash, turning east onto Springdale and then onto Central Avenue. The tape continued to play. A portion of the tape then showed a Saturn pulling onto the property and stopping. A man exited the vehicle and ran toward the front of the Saturn. Two men then ran back toward the driver's side of the Saturn and got into the back seat. The Saturn drove past the carwash bays and turned south in to an alley. The Explorer followed the Saturn out of the carwash.

Police officers subsequently informed Detective Still that a maroon Explorer was parked in the backyard at the Fosters' residence. Detective Still and other officers arrived at the location between 4:30 a.m. and 5:00 a.m. Ms. Foster answered the door and allowed Detective Still into her residence. Ms. Foster told Detective Still that Defendant was asleep in his bedroom. Detective Still accompanied Ms. Foster to the bedroom, and Ms. Foster woke up Defendant. Mr. McFarland was sleeping in the other bed. Detective Still detained both young men. Ms. Foster told Detective Still that she and her husband kept a weapon in their bedroom. Ms. Foster showed Detective Still a blue box on the night stand which contained a Lorcin .380 caliber semi-automatic pistol. The pistol's magazine was empty, and there was one live round in the chamber. Ms. Foster also consented to a search of the Explorer.

Defendant was transported to the Knox County Police Department. Detective Still read Defendant his Miranda rights, and Defendant executed a written waiver of those rights. Detective Still told Defendant that he wanted to talk with him about a shooting. Detective Still described Defendant's demeanor during the interview as "nonchalant, just no – no excitement, no – just pretty level." The videotape of Defendant's statement was played for the jury.

In his statement, Defendant said that Ms. Osborne repeatedly called Mr. McFarland on November 25, 2005, because Ms. Osborne was unhappy that Mr. McFarland had ended their relationship. Defendant acknowledged that racial slurs may have been exchanged. At approximately 11:00 p.m. or midnight, a man got on the telephone with Mr. McFarland and told Mr. McFarland to meet them at the carwash to "end this." Defendant said that he broke into the lockbox in his mother's bedroom and took a pistol that was encased in a blue box with gold lettering. Defendant thought it was a .22 caliber pistol. At first, Defendant denied that a third man accompanied him and Mr. McFarland to the carwash. After Detective Still informed Defendant that he had viewed a copy

of the carwash's security tape, Defendant said that he had picked up a third man at Mr. McFarland's direction. Defendant stated that he did not know the man's name.

Defendant said that he was driving his mother's maroon Ford Explorer and was wearing a white, short-sleeved tee shirt. Defendant pulled into one of the bays at the carwash, and the three men got out of the Explorer. Defendant said that he had the pistol in his pants pocket. They waited for a few minutes and then left when Ms. Osborne did not arrive. Defendant said that they drove around for a few minutes. Defendant pulled into the carwash again and spotted the Saturn. Two men jumped out of the Saturn, and the victim hit the Explorer's front passenger window with a "huge" pole. Defendant said that he picked up the gun, stepped out of his vehicle, and discharged his weapon as the victim ran around the front of the Explorer. Defendant said that he fired twice, and then the pistol jammed. Defendant cleared the jam and fired again at the Saturn. The Saturn drove out of the carwash.

Defendant said that the third man got out of the Explorer, and Defendant and Mr. McFarland drove to Ms. Osborne's house. Defendant said that he had picked up the bullets which had been dislodged when he cleared the jam. Mr. McFarland loaded the gun with the bullets and fired three times at Ms. Osborne's house. Defendant then drove back to his mother's residence, put the pistol back in the blue box, and set it on the night stand in his mother's bedroom. Defendant and Mr. McFarland went to bed without discussing the incident.

Defendant told Detective Still repeatedly that he was not scared when the victim ran toward his vehicle with a pole. Defendant said that he knew how to take care of himself because he had been in several street fights when he lived in California. Defendant stated that people made fun of him because his favorite band was the Insane Clown Posse, a rock/rap group. Defendant acknowledged that his vehicle's engine was running during the incident, and he could have driven away to avoid the confrontation. Defendant repeated again that he was not scared. Defendant stated that he was angry and did not want to be hit with the victim's stick. Defendant said that he had "a lot of hatred in his brain," and "something in his head" told him to discharge his weapon. Defendant acknowledged that he did not consider the consequences of his actions. Defendant stated that he was "just mad." Defendant said that he realized that he could kill the victim when he discharged the gun.

Detective Still said that Defendant's recitation of the events that night was consistent with the investigation and the witnesses' interviews. Detective Still stated that Defendant's expression did not change when he told Defendant that the victim was dead, and Defendant never asked about the victim's name.

On cross-examination, Detective Still acknowledged that according to the security tape, the time interval between the arrival of the Saturn at the carwash, and Mr. Hall's and the victim's reentry into the Saturn was sixteen seconds. Detective Still acknowledged that Defendant told him at the beginning of the interview that he could only read "a little bit." Detective Still stated, however, that Defendant told him that he went as far as the twelfth grade in school. Detective Still said that a small amount of glass had been found in the front seat of the Explorer. Detective Still stated that the third

man in the Explorer was never located because Mr. McFarland only knew him by his first name. Detective Still acknowledged that his investigation revealed that the victim and Mr. Hall were the first aggressors. Detective Still agreed that Defendant told him that Defendant had been involved in street fights while he lived in California, and that Defendant had been beaten with bricks, concrete blocks, and baseball bats. Detective Still said that he did not verify Defendant's description of the fights. Detective Still said that the poles used by the victim and Mr. Hall during the altercation were never found.

Officer Russell Whitfield, a forensic investigator with the Knoxville City Police Department, was dispatched to the carwash at approximately 1:47 a.m on November 26, 2005. Officer Whitfield testified that the following items were located at the carwash: a set of brass knuckles, a blue cigarette lighter, one live .380 caliber bullet, one spent .380 caliber bullet, and two .380 caliber shell casings. Officer Whitfield said that the position of the spent shell casings indicated that the shooter discharged his weapon from two different locations. The spent bullet was discovered some distance away from the shell casings and live bullets.

Officer Whitfield proceeded to Ms. Osborne's residence on East Quincey where he discovered two bullet holes on the right and left side of the residence's front door, and a bullet hole in the front bedroom window. Three spent .380 shell casings were found outside the residence. One bullet lodged in the wall behind the left side of the front door, one bullet traveled through the living room and lodged in the opposite wall, and one bullet traveled through the bedroom window above the bed and lodged in the wall. A silver, four-door, 2001 Saturn drove up to the residence. Officer Whitfield said that it appeared to him that a bullet had struck the top of the vehicle's roof. Officer Whitfield stated that he also received a Lorcin .380 caliber semiautomatic pistol from Detective Still which he logged into the evidence book. On cross-examination, Officer Whitfield acknowledged that he did not find any poles or sticks at the crime scene.

Officer Patricia M. Resig, a firearm examiner with the Knoxville Police Department's forensic unit, testified that she examined the Lorcin .380 caliber semiautomatic pistol found at the Foster residence, and five spent casings and two spent bullets recovered from the carwash and Ms. Osborne's residence. Officer Resig's analysis revealed that the bullets and casings were all fired from the Lorcin semiautomatic pistol. Officer Resig said that if the shooter did not have a firm grasp on the pistol, or had a "limp" wrist, the pistol tended to jam when fired.

Dr. Sandra K. Elkins, the Knox County medical examiner, testified that the victim's autopsy revealed a gunshot wound to the abdomen which caused the victim's death. Dr. Elkins stated that the bullet entered the left front of the victim's abdomen, traveled slightly downward to the right, and exited the victim's body in the right posterior lateral. Dr. Elkins said that the bullet's trajectory was consistent with the victim's left side being turned toward the shooter. Dr. Elkins found no stippling at the site of the wound and estimated that the shooter was standing more than two feet away from the victim when he discharged his weapon. Dr. Elkins said that the toxicology report did not reveal the presence of any alcohol in the victim's system, but detected the presence of atropine, a drug used during the attempt to resuscitate the victim, and oxycodone.

The State rested its case-in-chief, and Defendant presented his defense. Jackie Lynn Foster, Sr., Defendant's father, testified that he had wanted Defendant to excel at sports and "be tough." Mr. Foster stated, however, that Defendant was a quiet child who stayed in his room. Mr. Foster described Defendant as "a little wuss," and "a cry baby," and said that Defendant sucked his thumb until he was approximately thirteen years old. Mr. Foster said that even up to the time of the incident, Defendant had to have a light or the television on before he could go to sleep.

Mr. Foster said that the family lived in California until Defendant was in the fifth grade. Mr. Foster said that there were only three or four houses on their street in California and no problems with gangs. Mr. Foster described Defendant as "slow." Defendant was placed in special education classes in school and consistently made D's and F's. Mr. Foster said that Defendant could not read or write.

Mr. Foster said that if someone confronted Defendant, he "would draw up and drop that head," and not look the other person in the eye. Mr. Foster stated that he wanted Defendant to grow up unafraid and able to stand up for himself. Mr. Foster explained, "I was toughening him up for life in case I wasn't around." Mr. Foster said that he had never seen Defendant angry or violent. Mr. Foster stated that he kept a pistol in his bedroom for protection, but he had never taught Defendant how to fire the weapon. Mr. Foster said that Defendant was in the police car when he arrived home on November 26, 2005. Mr. Foster told Defendant "he was tough and he could handle this." Mr. Foster said that the windshield of the Ford Explorer had been broken out the night of the shooting and there were dents in the fender and hood.

On cross-examination, Mr. Foster explained that the windshield was still intact, but the safety plastic between the windshield had been shattered. Mr. Foster said that there were glass fragments in the front seat on both the passenger and driver's side. Mr. Foster acknowledged that the photographs of the Explorer taken after the shooting did not show any glass fragments in the front seat. Mr. Foster stated that he had not viewed the carwash's security tape, but he insisted that Defendant was afraid of the dark.

Mr. Foster said he knew that the Insane Clown Posse was Defendant's favorite musical group, and he had seen the group's video on television, but he did not listen to the words of the songs. Mr. Foster acknowledged that he taught Defendant to stand up and defend himself in a confrontation. Mr. Foster stated that everyone in the family knew the gun was in the house for protection, and he always kept it in a box on his night stand. Mr. Foster said that Defendant was often bullied but he was not aware that any of the confrontations led to a physical altercation. Mr. Foster also said that Defendant frequently lied.

Tony Eugene Grant, Defendant's brother-in-law, testified that he had known Defendant since Defendant was approximately five years old. Mr. Grant described Defendant as "soft spoken," a "coward," and "retarded, mentally." Mr. Grant stated that he had never seen Defendant angry or act violently, and Defendant was "absolutely great" with Mr. Grant's children. Mr. Grant said that Defendant was "constantly picked on" at school. Mr. Grant said that when Defendant told Mr.

Foster about the bullying, Mr. Foster became furious, yelling and screaming at Defendant to defend himself.

On cross-examination, Mr. Grant said that Defendant liked to watch videos and listen to music. He acknowledged that one of Defendant's favorite groups was the Insane Clown Posse which Mr. Grant described as "white rapping." Mr. Grant agreed that some of the group's lyrics promoted violence. Mr. Grant stated that Defendant also had a video game collection which included the WWE Raw Versus Smackdown.

Defendant testified on his own behalf. Defendant said that he always made bad grades in school, and people would call him names and push him around. Defendant stated that he was afraid to fight back. Defendant said that his father would scream at him for not fighting back and "being weak." Defendant stated that he had three friends in Knoxville, and they liked to "just hang out and listen to music." Defendant's favorite activity was skateboarding. Defendant said that he participated in the Special Olympics throughout high school and won "a couple" of medals.

Defendant said that Mr. McFarland was living at Defendant's house because Mr. McFarland's mother had told him to leave. Defendant said he did not speak on the cell phone. Defendant stated that he only went to the carwash because Mr. McFarland needed a ride. Defendant said that he did not personally know the victim, but he had heard that the victim was "tough." Defendant stated that he only knew Ms. Osborne "a little bit." Defendant said that he thought he and Mr. McFarland were just going to the carwash to fight. Although Defendant took the gun, it was Mr. McFarland's idea to take the gun with them. Defendant said that he had never fired the gun before the night of the shooting.

Defendant stated that they waited until his mother was in bed and then left the house in the Explorer. Mr. McFarland told Defendant to pick up another man, but Defendant did not know his name. Defendant drove to the carwash, and the three men exited the vehicle. Defendant carried the gun in his back pants pocket. Defendant said that that he intended to just show the gun in case they were ambushed. No one was at the carwash, so the three men left. Defendant said that Mr. McFarland received a call on his cell phone, and the group returned to the carwash. Defendant pulled up in front of the Saturn. Defendant said that two men jumped out of the Saturn "and started bashing [his] window in." Defendant said that he was "nervous and afraid." Defendant jumped out of the Explorer with the gun held by his side, pointed down. One of the men ran around the Explorer toward Defendant, holding up a pole, and Defendant said that he was afraid he was going to be hit. Defendant told the man, "I got a gun, quit running towards [sic] me." Defendant said that he lied when he told Detective Still that he was not afraid during the confrontation. Defendant said that he discharged his weapon once. Defendant did not think that he had injured the man because the man ran away. Defendant stated that he fired two more shots into the air to make sure that the group left. Defendant said that he was afraid that there was a gun in the Saturn. Defendant said that he drove away from the carwash at a fast speed because he was scared.

Defendant stated that he drove down Quincy Avenue because it was the quickest route to Defendant's house. Defendant said that Mr. McFarland sat on the edge of the passenger side window and discharged the gun over the Explorer's roof. Defendant said that he was afraid that his father would be angry over the damage to the Explorer, so, at Mr. McFarland's suggestion, he told his mother that a man named "Cory" had caused the damage.

Defendant said that he was twenty years old at the time of the incident. Defendant stated that he lied when he told Detective Still about the gangs in California, that he had been in jail before, and that he had been beaten by bricks, concrete blocks, or bats. Defendant said he felt "bad" about the victim's death when he learned the victim had a child. Defendant stated that he did not intend to hurt anyone when he went to the carwash.

On cross-examination, Defendant acknowledged that the Insane Clown Posse was his favorite musical group, and that his clothes on the night of the shooting reflected the group's symbols. Defendant said that the front of his shirt had a clown's face, and "a running hatchet man" with blood on the hatchet was depicted on the back. Defendant acknowledged that he had listened to the group's songs, "I Stab People" and "Under the Moon" which contained violent lyrics. Defendant stated that he was a "juggalo," the name given to male fans of Insane Clown Posse. Defendant acknowledged that part of the "Insane Clown Posse phenomenon" was backyard wrestling. Defendant said that the event involved pretending to fight and using hatchets or axes as a "stage prop."

Defendant said that he did not know whether Mr. McFarland called Ms. Osborne or Ms. Osborne initiated the series of cell phone calls on the night of the offense. Defendant denied that he heard Mr. McFarland make a racial slur and acknowledged that he lied to Detective Still about that aspect of the phone conversation. Defendant said that Mr. McFarland was angry when he hung up and said, "I'm about to go fight this dude." Mr. McFarland asked Defendant to drive him to the fight location. Defendant acknowledged that he did not have a driver's license, but he said that he did not refuse the request because Mr. McFarland was his friend. Defendant said that he thought he was going to just sit in the Explorer and "make sure nobody jumped in" while Mr. McFarland fought the other man. Defendant acknowledged that he could have refused to take the gun with them, but Mr. McFarland "talked [him] into getting it." Defendant stated that Mr. McFarland wanted him to take the gun in case "there was a bunch of people." Defendant said that he retrieved the gun from his parents' night stand and handed it to Mr. McFarland. Mr. McFarland placed the gun in the Explorer's middle console. Defendant said that he was nervous about the fight because he did not want anything bad to happen.

Defendant stated that Mr. McFarland told him that they were going to pick up another man before the fight on the drive to the carwash. A man was standing in front of a store on Central Avenue, and Mr. McFarland said, "That's him. Pick him up." Defendant acknowledged that he listened to music during the drive to the carwash but said it was "regular rap," not Insane Clown Posse. Mr. McFarland told Defendant to enter the carwash from the back alley. Defendant said that he was scared, but he did not want to appear weak. Defendant stated that Mr. McFarland jumped

-10-

out of the vehicle first, and he followed, putting the gun in his pants pocket. Defendant said the group left the carwash when no one showed up and went riding around. Someone called Mr. McFarland, and Mr. McFarland told Defendant to drive back to the carwash. Defendant pulled into a parking lot diagonally across from the carwash and began skateboarding. Mr. McFarland spotted the Saturn, and Defendant and Mr. McFarland got back into the Explorer and returned to the carwash.

Defendant stated that he pulled in beside the Saturn instead of in front of the vehicle. Defendant said that he saw only the victim with a pole in his hand. Defendant said that he was shocked and scared when the victim ran toward the passenger side of the Explorer. The victim struck the windshield twice and Defendant jumped out of the car because the glass was falling into the vehicle. Defendant grabbed the gun and stood behind the opened car door, holding the gun down by his side. Defendant called out, "I've got a gun," as the victim ran toward him. Defendant raised his gun and pulled the trigger. Defendant stated that the victim was turned sideways as if he were going to swing the pole. Defendant said that he did not know whether the bullet hit the victim. The victim ran away, and Defendant fired into the air. Defendant denied that the gun jammed while he was firing it, and stated that he would not have known how to clear a jam if one had occurred. Defendant said that he told Detective Still that he discharged his weapon several times to make himself "look tougher." Defendant denied that he picked up any bullets from the ground.

The State called Officer Kimberly Ashley with the Knox County Sheriff's Department as a rebuttal witness. Officer Ashley testified that her job responsibilities included monitoring the inmates' mail. Officer Ashley stated that Defendant was housed in an honor tank unit which meant that he could leave his cell for four or five hours a day. Officer Ashley said that Defendant informed the jail personnel that he did not suffer from any mental conditions and was not taking any medications. Officer Ashley stated that if Defendant had been bullied by the other inmates, he would have been removed from the unit. Officer Ashley said that according to the mail log, Defendant sent seventy-seven pieces of mail from the time of his incarceration on November 26, 2005, until February 13, 2007, and received two hundred and eleven pieces of mail during this time period. On cross-examination, Officer Ashley said that Defendant was not asked about any mental challenges during the intake interview, but she said that Defendant reported that he had graduated from high school. Officer Ashley acknowledged that she did not know if someone else read Defendant's letters to him or helped him compose his correspondence to others.

## II. Untimely Notice of Appeal

Before we determine the merits of the case, we must determine whether to hear the defendant's untimely appeal. The trial court entered its judgment of conviction on April 2, 2007, and Defendant untimely filed his motion for new trial on June 18, 2007. See Tenn. R. Crim. P. 33(b) (providing that a party requesting a new trial must file his or her request within thirty days of the entry of the order of the sentence). The trial court conducted a hearing on Defendant's new trial motion, after which the motion was denied. However, the trial court had no power to hear the Defendant's untimely motion for a new trial, and the order issued denying a new trial was a nullity.

-11-

State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007). An untimely motion for new trial "not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." Martin, 940 S.W.2d at 569. "If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e); Martin, 940 S.W.2d at 569).

Defendant's notice of appeal was untimely because the untimely motion for a new trial did not toll the thirty-day filing period for a notice of appeal. See Tenn. R. App. P. 4(c). The thirty-day period specified in Rule 4(a) of the Tennessee Rules of Appellate Procedure for filing a timely notice of appeal began to run on April 2, 2007, when the trial court entered Defendant's judgment of conviction, and the period ended on May 2, 2007. Tenn. R. App. P. 4(a), (c). Defendant filed his notice of appeal on July 13, 2007, after the period expired.

Unlike the untimely filing of Defendant's motion for a new trial, however, this Court does have authority to waive "in the interest of justice" the untimely filing of Defendant's notice of appeal. Tenn. R. App. P. 4(a). We believe that the interests of justice will be better served by waiving the timely filing of a notice of appeal, and we now proceed to address the issues in this case that are not waived by the failure to timely file the motion for new trial.

## III. Sufficiency of the Evidence

Defendant does not contest the fact that he shot the victim. Defendant argues, however, that the evidence is insufficient to support the jury's finding that Defendant knowingly killed the victim. Defendant contends that the sixteen seconds during which the offense occurred was too short a time span to form the requisite intent to support a conviction of second degree murder. Defendant submits that he acted in the heat of passion during an attack by the victim and that, essentially, he discharged his weapon in fear and confusion.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct

evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. T.C.A. §§ 39-13-201, -210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000); see also State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, Defendant, Mr. McFarland, and a third man drove to the carwash expecting an altercation with the victim. They arrived first and waited for the victim. Defendant carried his gun in his pocket. When the victim did not arrive, Defendant drove around for a few minutes. Mr. McFarland received word on the cell phone that the victim was on his way to the carwash. Defendant parked across the street where he could observe the carwash and began skateboarding. When Mr. McFarland spotted Ms. Mitchell's car, Defendant drove back to the carwash. The victim exited his car and struck the front windshield of Defendant's vehicle with a pole. Defendant stepped out of the Explorer with his gun and fired at the victim. Defendant then fired at Ms. Mitchell's car. After he left the carwash, Defendant drove by Ms. Osborne's residence where Mr. McFarland discharged his weapon at the home's facade. Defendant and Mr. McFarland then returned to Defendant's home and went to bed.

The jury was instructed both as to the elements of the offense of voluntary manslaughter and the defense of self-defense. The jury heard Defendant's testimony at trial and viewed the videotape of his statement to Detective Still. By its verdict, the jury rejected Defendant's argument that he acted in the heat of passion or in self-defense as was its prerogative. Defendant told Detective Still that he was not scared of the victim and that he discharged his weapon because he was angry. Defendant acknowledged both at trial and during his videotaped statement that he knew there was a possibility that he would kill the victim if he discharged his weapon.

Based on our review, we conclude that a rational trier of fact could conclude beyond a reasonable doubt that Defendant knowingly killed the victim. Defendant is not entitled to relief on this issue.

## IV. Admission of Evidence

Defendant argues that the trial court erred in allowing the State to introduce evidence, over Defendant's objection, concerning the lyrics and logos of the group Insane Clown Posse. Defendant contends that such evidence was not relevant and highly prejudicial. As the State argues, however, this issue is waived on appeal because Defendant untimely filed his motion for new trial. See Bough, 152 S.W.3d at 460 (citing Tenn. R. App. P. 3(e); Martin, 940 S.W.2d at 569). Therefore, we

-13-

may only review this issue for plain error. Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial. . . .").

In order to determine that plain error exists: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before plain error will be recognized. Id. at 282-83. Consideration of all of the factors is unnecessary when the record demonstrates that at least one of the factors cannot be established. Id. at 283. Furthermore, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Id. (quoting Adkisson, 899 S.W.2d at 642).

The topic of the musical group, Insane Clown Posse, was first introduced by Defendant during his interview with Detective Still. Defendant, who was wearing a shirt depicting the logos of the group, said that he was often bullied because he liked to listen to the group's music. Defendant explained that he was a "juggalo," the name attributed to male followers of the group. On cross-examination, the State questioned both Mr. Foster and Mr. Grant, without objection, about their knowledge of Insane Clown Posse and Defendant's interest in the group.

During cross-examination, the State questioned Defendant about his interest in Insane Clown Posse and the subject matter of some of the group's songs which offered murder as a solution to confrontation. At this point, defense counsel objected to the line of questioning, arguing that Defendant's interest in Insane Clown Posse was not relevant because there was no evidence that Defendant had listened to the music on the day of the shooting. At a bench conference out of the hearing of the jury, the State argued that the questions were relevant to Defendant's mental state at the time of the shooting. The trial court found that the evidence "would tend to be a little bit relevant to show the culpable mental state."

In order to convict Defendant of first degree murder, the State was required to prove beyond a reasonable doubt that Defendant acted with premeditation. Defendant told Detective Still that he was a fan of Insane Clown Posse whose rap lyrics promoted violence. Testimony concerning the nature of the group's lyrics and the extent of Defendant's following of the group was relevant in establishing Defendant's mental state at the time of the shooting. See Tenn. R. Evid. 401 (providing that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Nonetheless, in the case sub judice, the jury by its verdict rejected the State's argument that the victim's murder was premeditated because he was, in part, adversely affected by the lyrics of the Insane Clown Posse. Based on our review, we conclude that Defendant has failed to show that a clear and unequivocal rule of law was breached or that a substantial right was adversely affected. Thus, consideration of the error is not "necessary to do substantial justice," and the error is not "plain error." See Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.

## V. Sentencing Issues

The presentence report was introduced as an exhibit at the sentencing hearing without objection. According to the report, Defendant was twenty-two years old at the time of the sentencing hearing. Defendant reported dropping out of high school after completion of the eleventh grade because school "was too difficult," and stated that he attended special education classes while he was in public school. Defendant reported a sporadic work history with a grocery store, a fast food restaurant, and a service company. Defendant stated in the presentence report that he first used alcohol at age seventeen and had last used alcohol two years before the sentencing hearing, and used marijuana "a few times" between the ages of fifteen and seventeen.

Officer Tom Walker, with the gang unit of the Knox County Sheriff's Office, testified that his investigation revealed that Defendant was a member of Insane Clown Posse which has been categorized as a gang in Knox County. Officer Walker stated that a "gang" has three or more members, utilizes symbols that represent the group, has a recognized leadership structure, and meets on a regular basis or has continual communications. Officer Walker identified certain pages of a letter received by Defendant while incarcerated in the jail which depicted the symbols of Insane Clown Posse. Officer Walker explained that the group made six albums, each with a different "insane clown" on the cover. When all six clowns are portrayed together, they are referred to as the "dark carnival." The group's symbols include hatchets, machetes, and large knives. Members of the gang tattoo the initials "ICP" onto their bodies. The writer of the letter to Defendant closed with "MCL," which means "much clown love."

Officer Walker stated that inmates are permitted to make telephone calls from the jail. A prerecorded message is played at the initiation of a call warning the caller that the conversation is recorded and may be used against him or her in court. A telephone call made by Defendant to Wendy and Troy Grant on February 16, 2007, after the jury's verdict, was played for the court. During the call, Mr. Grant stated that he did not believe that Defendant had killed the victim. Mr. Grant said that if Ms. Mitchell had driven to St. Mary's Hospital, which was two blocks away from the crime scene, instead of across the river to Baptist Hospital, the victim would not have died. Defendant said that he was "glad you know who didn't get involved, you know what I'm talking about?" Defendant expressed relief because the jury returned a verdict of not guilty on first degree murder and convicted him instead of second degree murder. Defendant discussed his "good time credits," and Ms. Grant assured Defendant he would be out in "no time." Defendant said that he would get paid to get his G.E.D. and looked forward to going to the penitentiary where he believed he would have more freedom.

On cross-examination, Officer Walker said that Insane Clown Posse was classified as a gang by the sheriff's department approximately seven months prior to the hearing. Officer Walker stated, however, that he was aware of the Insane Clown Posse before the murder occurred. Officer Walker said that there had been several incidents of vandalism in Knox County where racial slurs and the Insane Clown Posse's symbols were painted on people's property. Officer Walker acknowledged that no charges had yet been filed in the vandalism cases. Officer Walker said that the department had identified six members of the gang, and all six had been arrested for various crimes utilizing the symbols of Insane Clown Posse. Officer Walker acknowledged that Defendant did not have any tattoos.

Eugene Underwood, the victim's grandfather, George Underwood, the victim's uncle, and Yvonne Sheppard, the victim's mother, testified about the victim's life, his relationships with his children and family, and the effect of the victim's death on the family.

Defendant's father, Jackie Foster, Sr., testified on Defendant's behalf. Mr. Foster said that Defendant's high school record shows that Defendant is mentally challenged. A certified copy of Defendant's high school record was introduced as an exhibit at the sentencing hearing. The record reflects that Defendant made four "F's" in the first semester of ninth grade, but earned two "A's" and two "B's" the second semester. In the tenth grade, Defendant failed the majority of his classes. In the eleventh grade, Defendant earned four "B's," two "A's," and failed two classes.

Defendant was convicted of second degree murder, a Class A felony. As a Range I, standard offender, Defendant is subject to a sentence range of between fifteen and twenty-five years. T.C.A. § 40-35-112(a)(1). At the conclusion of the sentencing hearing, the trial court considered Defendant's lack of remorse exhibited during his videotaped statement, the trial, the sentencing hearing, and the telephone call to the Grants. As an enhancement factor, the trial court placed great weight on the fact that Defendant had no hesitation about committing a crime where the risk to human life was high. See id. § 40-35-114(10). The trial court also found that Defendant was a leader in the commission of the crime, and more than one victim was involved in the offense. See id. §§ 40-35-114(2) and (9). In mitigation of the length of Defendant's sentence, the trial court placed some weight on the presence of provocation during the incident. See id. § 40-35-113(2). After considering the enhancement factors and one mitigating factor, the trial court sentenced Defendant to twenty-three years.

Defendant does not challenge the trial court's application of enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high. See id. § 40-35-114(10). On appeal, however, Defendant argues that the trial court erred in finding that he was a leader in the commission of the offense and that the offense involved more than one victim. Defendant contends that the evidence did not support these findings, and, in any event, application of these enhancement factors violated his sixth amendment right to have a jury determine the presence of these factors. See Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). Defendant also argues that the trial court erred in not considering several mitigating factors. See T.C.A. § 40-35-113 (3), (6), (8), (11), (12), and (13). Defendant submits that based on the number

-16-

of mitigating factors which he contends are appropriate and the presence of one enhancement factor, the trial court should have sentenced him to the minimum sentence in the sentencing range, fifteen years.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. See id. § 40-35-401, Sentencing Comm'n Cmts; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. Carter, 254 S.W.3d at 345 (quoting State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); State v. Pierce, 138 S.W.3d 820, 827 (Tenn. 2004)). Because we conclude that the trial court erred in applying enhancement factor (3), the offense involved more than one victim, our review is de novo without a presumption of correctness.

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." Carter, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

A. Blakely Challenge

Tennessee's pre-2005 sentencing law was constitutionally infirm in the wake of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), which held that Washington's scheme for a judge's enhancement of a sentence ran afoul of the Sixth Amendment to the United States Constitution. See id. at 301, 124 S. Ct. at 2536 ("'Other than the fact of a prior conviction, any fact

that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)); see also State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) (applying the principles of Blakely to determine that Tennessee's pre-2005 sentencing code violated the defendant's right to jury trial). Defendant committed his offense, however, in November 2005, after the 2005 amendments to the sentencing act became effective on June 7, 2005. See 2005 Tenn. Pub. Acts, ch. 353. The 2005 version of the sentencing law, pursuant to which Defendant was sentenced, complies with Sixth Amendment principles. See Cunningham v. California, 549 U.S. 270, 293 n.18, 127 S. Ct. 856, 871 n. 18 (2007) (citing the 2005 version of Tennessee Code Annotated section 40-35-210(c) as a statute that "permit[s] judges genuinely 'to exercise broad discretion . . . within a statutory range,' which 'everyone agrees' encounters no Sixth Amendment shoal'"); Carter, 254 S.W.3d at 343 (Tenn. 2008) (stating that the 2005 amendments were enacted "[i]n order to avoid the constitutional violation arising from a trial court['s] increasing a presumptive sentence on the basis of judicially-determined enhancement factors"). Thus, we conclude that Defendant is not entitled to relief on the basis of his constitutional challenge to the length of his sentence.

B. Enhancement Factors

We conclude, and the State concedes on appeal, that the trial court misapplied enhancement factor (3), the offense involved more than one victim. Defendant was convicted of committing second degree murder against a specific, named victim. Our supreme court has held that there cannot be multiple victims for any one offense where the indictment specifies a named victim. State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002). The Imfeld court noted that "[t]he statutory language of the 'multiple victims' factor, however, limits its application to 'an offense' involving 'more than one (1) victim.'" Id. (quoting T.C.A. § 40-35-114(3)).

Defendant argues that the trial court erred in finding that he was a leader in the commission of the crime. See T.C.A. § 4035-114(2). Defendant contends that Mr. McFarland orchestrated the meeting at the carwash, that the disagreement was between Mr. McFarland and the victim and his friends, not Defendant, and that it was Mr. McFarland's idea to bring the gun with them.

First, we observe that "enhancement for being a leader in the commission of an offense does not require that the defendant be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Although the evidence at trial showed that the initial disagreement occurred between Mr. McFarland and Ms. Osborne and her friends, once the decision was made to meet at the carwash, it was Defendant who provided the means of transportation and the weapon. Defendant armed himself with his gun when he and Mr. McFarland first arrived at the carwash and waited for Ms. Osborne to arrive. When the altercation actually took place, only Defendant got out of his car, again armed with his gun. Defendant acknowledged in his statement that he could have exited the carwash after the victim hit the windshield of his vehicle but chose instead to confront the victim. Based on our review, we conclude that the trial court did not err in finding that Defendant was a leader in the commission of the crime.

C. Mitigating Factors

Defendant argues that the trial court erred in not considering the following mitigating factors: that Defendant was under extreme duress; that he suffered from a mental "slowness" that "significantly reduced his culpability for this offense"; that he lacked substantial judgment; that Defendant's mental disability coupled with the victim's aggression created such an unusual situation that it is unlikely that a sustained intent to violate the law motivated his conduct; and that Defendant has no criminal history. See T.C.A. § 40-35-113 (3), (6), (8), (11), (12), and (13). The record shows that the trial court considered each of the proposed factors, and, after consideration, rejected all of the factors other than the fact that Defendant acted under some provocation which was the trial court's discretion. The trial court found:

> [I]n considering the mitigating factors, a strong provocation, well, the gun was there. And the fact they beat up that car is the only provocation that would justify any type of – of retaliation in any form, but that's not a defense to use the gun. That certainly is not something that – but at the same time, I think that there should be some reduction from the maximum sentence because of that.

Based on our review, we conclude that the trial court did not err in not applying other mitigating factors to Defendant's sentence.

Although we conclude that the trial court misapplied one enhancement factor, this error does not necessitate a sentence modification. See State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) ("The mere number of existing enhancement factors is not relevant-the important consideration being the weight to be given each factor in light of its relevance to the defendant's personal circumstances and background and the circumstances surrounding his criminal conduct."). In addition to its finding that Defendant was a leader in the commission of the offense, the trial court found that Defendant had no hesitation about committing a crime when the risk to human life was high, and found that this factor was "certainly important to this Court in making a decision." See T.C.A. § 40-35-114(10). The proof at trial showed that Ms. Mitchell and Ms. Osborne were sitting in the front seat of Ms. Mitchell's vehicle when Defendant stepped out of his vehicle and discharged his gun first at the victim and then at the women. We conclude that a proper balancing of the enhancement and mitigating factors supports the twenty-three-year sentence imposed by the trial court. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE